IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | 4:20-CR-3085 |
| vs. | | TENTATIVE FINDINGS |
| DAKOTA S. SMITH, | | |
| Defendant. | | |

The Court has received the revised presentence investigation report in this case. There are no objections to the presentence report. The defendant has filed a motion for variance. Filing 53.

Since 2013, the Court has consistently determined whether to vary in non-production child pornography cases using the factors enumerated in *United States v. Abraham*, 944 F. Supp. 2d 723 (D. Neb. 2013). In that case, the Court explained at length why the applicable sentencing guideline, U.S.S.G. § 2G2.2, doesn't help the Court distinguish between offenders based on their relative culpability and dangerousness. *Abraham*, 944 F. Supp. 2d at 728-30. The Court also articulated a modified § 2G2.2 framework to help guide its decisionmaking in non-production child pornography sentencings. *Abraham*, 944 F. Supp. 2d at 730-36. The Court's decision was driven by the work of the U.S. Sentencing Commission in its 2012 report on § 2G2.2. *See* United States Sentencing Commission, *Report to Congress: Federal Child Pornography Offenses* ("2012 Report") (Dec. 2012), https://bit.ly/3B7XPzX.

The Commission has since updated its work. *See* United States Sentencing Commission, *Federal Sentencing of Child Pornography: Non-Production Offenses* (Jun. 2021) ("2021 Report"), https://bit.ly/3m9O8gh. The Court will, likewise, consider the 2021 Report to ensure that the modified

framework introduced in *Abraham* continues to reflect the careful study and empirical data upon which a sentencing guideline *should* be based. *See Abraham*, 944 F. Supp. 2d at 728.

U.S.S.G. § 2G2.2

Section 2G2.2, as written, begins with the base offense level: possession of child pornography is assigned a base offense level of 18, while receipt or distribution is base offense level 22. § 2G2.2(a). But if the defendant did not *intend* to traffic in or distribute material involving the sexual exploitation of a child, then a 2-level decrease is warranted. § 2G2.2(b)(1). From there, a number of specific offense characteristics may increase the offense level:

- Material involving a prepubescent minor or a minor under the age of 12: 2 levels. § 2G2.2(b)(2).
- Distribution for pecuniary gain: At least 5 levels depending on the retail value of the material. § 2G2.2(b)(3)(A).
- Distribution for non-pecuniary "valuable consideration": 5 levels. § 2G2.2(b)(3)(B).
- Distribution to a minor: 5 levels. § 2G2.2(b)(3)(C).
- Distribution to a minor intended to induce the minor to engage in prohibited sexual conduct: 7 levels. § 2G2.2(b)(3)(E).
- Distribution to a minor intended to induce other unlawful activity: 6 levels. § 2G2.2(b)(3)(D).
- Any other knowing distribution: 2 levels. § 2G2.2(b)(3)(E).
- Material depicting sadistic or masochistic conduct, or sexual abuse or exploitation of an infant or toddler: 4 levels. § 2G2.2(b)(4).
- A pattern of activity involving sexual abuse or exploitation of a minor: 5 levels. § 2G2.2(b)(5).
- Use of a computer: 2 levels. § 2G2.2(b)(6).
- Between 10 and 150 images: 2 levels. § 2G2.2(b)(7)(A).
- Between 150 and 300 images: 3 levels. § 2G2.2(b)(7)(B).
- Between 300 and 600 images: 4 levels. § 2G2.2(b)(7)(C).
- More than 600 images: 5 levels. § 2G2.2(b)(7)(D).

UNITED STATES V. ABRAHAM

In *Abraham*, the Court discussed at length why § 2G2.2 was outdated, and operated to concentrate most offenders at or near the statutory maximum with little regard for the offense characteristics that actually distinguish the most culpable offenders from those who committed mine-run offenses. 944 F. Supp. 2d at 728-30. The Court declined to abandon the guideline outright, but instead afforded it less weight, and set forth a modified framework in furtherance of "the responsibility that accompanies the rejection of a Guideline: to formulate a reasoned alternative based upon the court's own penal theory." *Id*. at 730 and n.5.

The Court began, as does the guideline, with the base offense level: because there is little rational basis to treating receipt and possession differently in non-production cases, and because a separate enhancement addresses the conduct of distribution, the Court elected to begin with a base offense level of 20 for a mine-run offender whether convicted of possession or receipt and distribution. *Id*. at 731. From there, the Court addressed the continued viability and applicability of the various enhancements.

From the outset, the Court rejected the enhancement for use of a computer: simply put, everyone uses a computer now. *Id*. at 731. With respect to distribution, the Court was limited by the facts of the case to discussing the use of peer-to-peer ("P2P") networks, which are a common means of *obtaining* child pornography, but also by their nature involve file-sharing and thus distribution. *Id*. at 734-35. Such technology, under § 2G2.2(b)(3)(A), warrants a 5-level increase for distributing in exchange for valuable consideration: because the user's participation in the P2P network is conditioned on file-sharing in both directions, the user is said to be distributing child pornography in exchange for obtaining it. *See Abraham*, 944 F. Supp. 2d at 735. But the Court opined that a blanket 5-level enhancement for distribution, in the P2P context, doesn't

distinguish among offenders, who display a broader range of culpable conduct than simply using a P2P network. *Id.* Accordingly, the Court described a spectrum between the least culpable distributors (for whom distribution was simply incident to their use of a P2P network) and the most culpable offenders (who took conscious steps to facilitate distribution). *Id.*

With respect to the enhancements based on the content of the offender's collection—minors under 12, sadistic or masochistic conduct, and material depicting infants or toddlers—the Court explained that the worst offenders were those who specifically sought out such material, and whose collections were more devoted to it. *Id.* at 733. And with respect to the number of images, the Court did its best to "recalibrate" the enhancement to current realities, given that the Internet had made it possible for even typical offenders to have hundreds or thousands of images. *Id.* at 734. So, the Court determined to attempt a realistic estimate of the number of discrete images, and would also consider the duration and intensity of the offender's collecting behavior. *Id.* at 733-34.

Finally, the Court noted certain factors recommended in the 2012 Report that weren't accounted for in § 2G2.2:

1)      the content of an offender's child pornography collection and the nature of an offender's collecting behavior (in terms of volume, the types of sexual conduct depicted in the images, the ages of the victims depicted, and the extent to which an offender has organized, maintained, and protected his collection over time, including through the use of sophisticated technology);

2)      the degree of an offender's engagement with other offenders—
        in particular, in an Internet "community" devoted to child
        pornography and child sexual exploitation; and

3)      whether an offender has a history of engaging in sexually
        abusive, exploitative, or predatory conduct in addition to his
        child pornography offense.

*Abraham*, 944 F. Supp. 2d at 732 (quoting 2012 Report at 320). The Court
agreed that those factors warranted consideration. *Id*.

## THE 2021 REPORT

The 2021 Report reaffirms the Court's doubts about § 2G2.2. The Court
noted in *Abraham* that § 2G2.2 was written for offenders who used the postal
system to purchase obscene material, 944 F. Supp. 2d at 729, and was as a result
ill-suited to a world in which such material was readily available on the Internet
for free. Since then, networks have gotten faster and storage space bigger and
cheaper, meaning that § 2G2.2 is even more outdated. As the Sentencing
Commission concluded,

> the conduct covered by four of the six enhancements—accounting
> for a combined 13 offense levels—has become so ubiquitous that
> they now apply in the vast majority of cases sentenced under
> §2G2.2. Conversely, significant aspects of an offender's collecting
> behavior, involvement in a child pornography community, and
> aggravating sexual conduct such as past or concurrent contact
> offenses may not be accounted for in the guideline at all. In short,
> the guideline is both overinclusive and underinclusive. Thus, it no

> longer effectively differentiates among offenders in terms of either
> the seriousness of the offense or culpability of the offender.

2021 Report at 68-69. But the Commission's specific findings regarding the base offense level, particular enhancements, and different characteristics that actually *do* distinguish among offenders, warrant further discussion.

To start with, the Commission found that "[n]early all offenders convicted solely of possession had engaged in knowing or attempted receipt, distribution, or production of child pornography and, therefore, could have been charged with an offense carrying significantly higher penalties." *Id*. at 49; *see id*. at 12. That's meaningful with respect to the base offense level: it suggests that it's faulty to premise the Guidelines calculation on the difference between receipt, possession, and distribution because that difference rests more on prosecutorial charging decisions (and perhaps the plea-bargaining process) than on the offender's actual conduct. As a practical matter, there certainly oughtn't be a presumptive 4-level difference between those offenders.

So, too, do the enumerated enhancements fail to make useful distinctions. As in 2013, an enhancement for use of a computer is effectively an increase in the base offense level: in 2019, every offender used mobile or digital means to acquire child pornography. *Id*. at 19, 32. Nearly every offender had material depicting victims who were prepubescent or under the age of 13, and the enhancement for material depicting sadistic or masochistic conduct or depicting sexual abuse or exploitation of an infant or toddler was also applicable in most cases. *Id*. at 4, 19. Distribution, on the other hand, presents a broader variety of conduct that § 2G2.2 oversimplifies: the typical offender received or distributed child pornography using a P2P network and not for financial gain, but about 25 percent of offenders also "engaged in 'personal' distribution to another

individual through chatrooms, email, or closed or private P2P programs." 2021 Report at 37.

Taken together, the Commission's findings regarding those enhancements suggest the enhancements for use of a computer and premised on the content of the collection should carry little weight as a matter of course. Enhancement for distribution, on the other hand, should be more finely calibrated to the range of conduct in which offenders actually engage.

The Commission also found that some offenders—but a distinct minority—used sophisticated means to conceal their receipt or distribution. 2021 Report at 35. Such efforts included using the Dark Web, security software, encryption, or cryptocurrency. *Id*.

Finally, the Commission found that instead of the enhancements set forth in § 2G2.2, courts rely on factors not accounted for in the Guidelines—in particular, the factors that the Commission set forth in the 2012 Report and that the Court agreed were worthwhile in *Abraham*: "the content of the offender's collection; the offender's degree of involvement in an internet child pornography community; and the offender's prior or concurrent engagement in sexually abusive or exploitive conduct." 2021 Report at 53. That finding is significant to the Court for reasons going beyond the flaws in § 2G2.2, because the initial intent of the Guidelines was to diminish sentencing disparity and base punishment on the actual conduct underlying the offense of conviction. *See United States v. Booker*, 543 U.S. 220, 250-51 (2005). We know that § 2G2.2 fails at that purpose, but to actually fulfill it, a court should endeavor to consider the same principles that other courts consider in sentencing.

MODIFIED § 2G2.2 FRAMEWORK

In accordance with the Commission's findings, the Court finds that the following modified base offense level and enhancements will appropriately guide its discretion in these difficult sentencing decisions:

- Base offense level: 20. As explained in *Abraham* and the 2021 Report, there is little difference in practice between offenders convicted of possession or receipt and distribution. "For the rare possession offender who has not engaged in any distribution, a reduction may be warranted. And for those offenders engaged not only in receipt, but in distribution, the separate distribution enhancement can be used to more accurately assess culpability." 944 F. Supp. 2d at 731 (citation omitted).

- Distribution: Add up to 5 levels, considering the degree to which the offender actively sought to engage in and facilitate delivery of child pornography.[1] For instance, an offender whose distribution was passive and merely incidental to obtaining the material might receive a 1- or 2-level enhancement. An offender who engaged in "personal" distribution, deliberately sharing with another, might receive a 3- or 4-level enhancement. And an offender who actively sought to facilitate mass distribution—for instance, creating or maintaining digital infrastructure that permits anonymous file-sharing—might receive a 5-level enhancement. *See id*. at 735.

---

[1] The Court sees little purpose to distinguishing between distributing for "pecuniary gain" and distributing for free: knowing and deliberate distribution of child pornography is culpable regardless. The Court's focus is on what the offender did to distribute material and how determined and successful those efforts were.

- Distribution to a minor: Add 5, 6, or 7 levels, depending on the offender's intent. *See* § 2G2.2(b)(3)(C), (D), and (E).

- Material depicting sadistic or masochistic conduct, or depicting sexual abuse or exploitation of an infant or toddler: Add up to 4 levels, *if* there is evidence that the offender deliberately sought out and collected such material. For instance, an offender who is shown to have used unique search terms seeking such material, or expressly requested such material from others, might receive a 1- or 2-level enhancement. An offender whose collection was primarily devoted to such material, or who intentionally distributed such material, might receive a 3- or 4-level enhancement.

- Prior or concurrent engagement in sexually abusive or exploitive conduct: Add up to 5 levels. This enhancement captures both the existing enhancement for a pattern of activity involving sexual abuse or exploitation of a minor and the Commission's recommendation that sexually abusive or exploitive conduct should be (and is, by many courts) more generally considered. *See* § 2G2.2(b)(5); 2021 Report at 53; *Abraham*, 944 F. Supp. 2d at 732. For instance, an offender who engaged in a single instance[2] of non-conduct solicitation of a minor might receive a 1- or 2-level enhancement, an offender who committed a single prior instance of abusive contact might receive a 3- or 4-level enhancement, and an offender who engaged in a pattern of activity involving the sexual abuse or exploitation of a minor will still receive the 5-level enhancement provided by § 2G2.2(b)(5).

- Use of a computer: No enhancement.

---

[2] A "pattern of activity" for purposes of the existing guideline requires 2 or more separate instances. *See* § 2G2.2 cmt. n.1.

- More than 5,000 images: Add 2 levels.[3]
- Sophisticated means: Add 2 levels if the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. *Cf.* U.S.S.G. § 2B1.1(b)(10). Such means may include distribution or receipt on the Dark Web, use of dedicated software to destroy evidence, encryption, or cryptocurrency.
- Engagement with a community devoted to child pornography and child sexual exploitation: Add up to 5 levels. This enhancement is premised on the offender's involvement in, and the offender's *degree* of involvement in, such a community. *See* 2021 Report at 28, 36. For instance, an offender whose participation in such a community was limited to seeking out material or advice might receive a 1- or 2-level enhancement. An offender whose participation included active and regular engagement, and encouraging the participation and misconduct of others, might receive a 3- or 4-level enhancement. And

---

[3] In *Abraham*, the Court declined to assign specific numerical ranges to the enhancement for number of images, noted that it was "the sort of task for which the Commission's empirical expertise would be helpful." 944 F. Supp. 2d at 734 n.8. The 2021 Report provides some data in that regard, *see* 2021 Report at 30, permitting the Court to estimate that 5,000 images is a fair benchmark for when an offender's collection is larger than average. That said, the Court declines to impose a more granular standard: the data doesn't support it, the equation of 1 video to 75 still images is imperfect at best, and in any event the number of images is only a rough proxy for the amount of harm caused. Has an offender with 100 images of the same victim done more damage than an offender with only 10 images, but of 10 different victims? It strikes the Court that the number of unique *victims* would be a useful metric for measuring relative culpability, but the Commission hasn't gathered that data.

an offender who was a leader or organizer of such a community might deserve a 5-level enhancement.

That said, this is a work in progress, and the Court is not bound by this framework any more than it's bound by § 2G2.2. The Court not only has the right, but the responsibility to tailor the result in any given case to the unique circumstances it presents. But the Court is hopeful that stating these principles clearly will inform the parties of the starting point that the Court intends to use for its sentencing decision, and will permit them to present evidence and argument relevant to the Court's deliberative process.[4] Accordingly,

IT IS ORDERED:

1.   The Court will consult and follow the Federal Sentencing Guidelines to the extent permitted and required by *Booker*, 543 U.S. 220, and subsequent cases. In this regard, the Court gives notice that, unless otherwise ordered, it will:

(a)   give the advisory Guidelines respectful consideration within the context of each individual case and will filter the

---

[4] The Court appreciates the detailed suggestions provided by the parties. *See* filing 55; filing 57. The Court has attempted here to provide a more comprehensive rubric than the necessarily tentative revisions advanced in *Abraham*—and it's in a position to do so because of both the 2021 report *and* its years of experience in applying *Abraham*. The Court is, nonetheless, not in a position to comfortably go into even more detail, for two reasons. First, the Court needs to see how this works in practice—it wouldn't help anyone to articulate a rule that ends up being honored more in the breach. And second, we're all in this mess because § 2G2.2 wasn't flexible enough to accommodate technological changes that still continue apace. The Court is disinclined to repeat that mistake.

Guidelines' advice through the 18 U.S.C. § 3553(a) factors, but will not afford the Guidelines any particular or "substantial" weight;

(b)   resolve all factual disputes relevant to sentencing by the greater weight of the evidence and without the aid of a jury;

(c)   impose upon the United States the burden of proof on all Guidelines enhancements;

(d)   impose upon the defendant the burden of proof on all Guidelines mitigators;

(e)   depart from the advisory Guidelines, if appropriate, using pre-*Booker* departure theory; and

(f)   in cases where a departure using pre-*Booker* departure theory is not warranted, deviate or vary from the Guidelines when there is a principled reason justifying a sentence different than that called for by application of the advisory Guidelines, again without affording the Guidelines any particular or "substantial" weight.

2.   There are no objections that require resolution at sentencing. The defendant's motion for variance (filing 53) will be resolved at sentencing considering the principles set forth above.

3.   Except to the extent, if any, that the Court has sustained an objection, granted a motion, or reserved an issue for later resolution in the preceding paragraph, the parties are notified that the Court's

tentative findings are that the presentence report is correct in all respects.

4.    If any party wishes to challenge these tentative findings, that party shall, as soon as possible (but in any event no later than three (3) business days before sentencing) file with the Court and serve upon opposing counsel an objection challenging these tentative findings, supported by a brief as to the law and such evidentiary materials as are required, giving due regard to the local rules of practice governing the submission of evidentiary materials. If an evidentiary hearing is requested, such filings should include a statement describing why a hearing is necessary and how long such a hearing would take.

5.    Absent timely submission of the information required by the preceding paragraph, the Court's tentative findings may become final and the presentence report may be relied upon by the Court without more.

6.    Unless otherwise ordered, any objection challenging these tentative findings shall be resolved at sentencing.

Dated this 25th day of October, 2021.

BY THE COURT:

John M. Gerrard
United States District Judge